AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of West Virginia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1302 7th Avenue<br>Charleston, WV 25302 | )<br>)<br>)<br>)<br>)<br>) |

Case No.  2:11-mj-00114

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Southern _____ District of _____ West Virginia _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. §§ 7201, 7202; 18 U.S.C. § 371; 18 U.S.C. § 922 (g)(1) | Attempt to evade or defeat tax; willful failure to pay over tax; conspiracy to impair and impede the lawful function of the IRS; unlawful possession of a firearm by a felon. |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Eric J. Phillips
*Printed name and title*

Sworn to before me and signed in my presence.

Date: *Oct. 12, 2011*

*Judge's signature*

City and state:  Charleston, WV

Mary E. Stanley, U.S. Magistrate Judge
*Printed name and title*

FILED

OCT 1 7 2011

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

ATTACHMENT A

The principal address of Law Land and Leasing, Inc. and Wildwood Realty, Inc. is located at 1302 7th Avenue, Charleston, Kanawha County, West Virginia, 25302; more particularly described as a two story, square shaped building, and partially sided with tan siding, situated on the corner lot of 7th Avenue and Beatrice Street.  See photos A and B.

PHOTO A: 1302 7th Avenue



PHOTO B: 1302 7th Avenue



ATTACHMENT B

I.   Any and all firearms or ammunition.


II.   Items pertaining to A E Associates, Ltd., Allegheny Eastern Associates, Inc., Law Land and Leasing, Inc., and Wildwood Realty Inc., (hereafter referred to as "the entities"), Lewis R. Law, Keri B. Law, and Ruth Law, individually, for the period January 1, 2006 to the present:

1.   All documents relating to the formation of the entities, and any amendments thereto including:

    a.   Articles of incorporation or organization
    b.   By Laws or operating agreement
    c.   Minute books
    d.   Stock or unit books
    e.   Stock or unit transfer records
    f.   Annual reports filed with the state of incorporation or organization

2.   All documents (including computer tapes or discs) summarizing annual, quarterly, monthly, weekly or daily financial performance of the entities, including:

    a.   Annual auditor's report
    b.   Annual financial statements, including:

        i.   Balance Sheets
        ii.  Statements of Operations (Profit & Loss Statements)
        iii. Annual filings with the SEC or other federal or state agencies or regulatory bodies

    c.   Trial balances
    d.   Federal and state income tax returns and quarterly estimated tax returns
    e.   Sales tax returns

3.   Employment records, including:

    a.   Payroll journals
    b.   Annual recap of wages paid (filed with the IRS)
    c.   All W-2s and Forms 1099s issued
    d.   All forms 940 and 941 filed
    e.   All state employment and unemployment returns filed
    f.   All checks or other payment documents issued as salary, commission, bonus, guaranteed partner

payments, or other earned income payments

   g.   All contracts or other agreements made or entered into by the entities.

4.   Any and all correspondence, letters, faxes, email, files or other documents reflecting telephone conversations, meetings, contracts, agreements, or transactions to or from the entities.

5.   Copies of all documents in books of original entry (including computer tapes or discs) containing entries reflecting any and all transactions of the entities, including:

   a.   General ledgers
   b.   General journals
   c.   Summary journals, including:

      i.   Sales journals
      ii.   Purchase journals
      iii. Cash receipts journals
      iv.   Cash disbursements journals

   d.   Invoices
   e.   Sales receipts
   f.   Purchase orders
   g.   Receiving reports
   h.   Inventory records
   i.   Expense Reports

6.   Retained copies of all documents relating to the entities' banking transactions, including:

   a.   All documents pertaining to all open or closed checking, savings, NOW, Time, or other deposit or checking accounts held in the name of, for the benefit of, or under the control of the entities, including:

      i.   Retained copies of signature cards
      ii.   Corporate board authorization minutes or partnership resolutions
      iii. Bank statements
      iv.   Cancelled checks
      v.   Deposit tickets
      vi.   Retained copies of items deposited
      vii. Retained copies of credit and debit memos
      viii. Forms 1099, 1089, or back-up withholding documents

   b.   All documents pertaining to open or closed bank loans or mortgage documents, reflecting loans made

to, co-signed by, or made for the benefit of the entities, including:

    i.   Loan applications

    ii.  Corporate board authorization minutes or partnership resolutions

    iii. Loan statements

    iv.  Documents (including checks, debit memos, cash receipts, wire transfer documents), reflecting the means by which loan repayments were made

    v.   Retained copies of documents (including bank checks, credit memos, wire transfer documents) reflecting disbursement of the loan proceeds

    vi.  Copies of loan correspondence, including:

        (1)  Letters to the bank

        (2)  Letters from the bank

        (3)  Notes and memoranda to the file

    vii. Collateral agreements and documents

    viii. Credit reports

    ix.  Financial statements

    x.   Notes or other instruments reflecting the obligation to pay

    xi.  Real estate mortgages, chattel mortgages or other security instruments for loans

    xii. Forms 1099, 1089 or back-up withholding documents

    xiii. Loan amortization statements

c.   All documents relating to loans made by the entities, including:

    i.   Loan applications

    ii.  Members' or directors' authorizing resolutions or partnership resolutions

    iii. Loan Statements

    iv.  Documents (including bank checks, credit memos, wire transfer records) reflecting the means by which loan repayments were made; and

    v.   Documents (including bank checks, credit memos, and wire transfer records) reflecting the disbursement of loan proceeds.

d.   All documents pertaining to Certificates of Deposit purchased or redeemed by or for the benefit of the

3

entities, including:

    i.    Copies of certificates
    ii.   Corporate board authorization minutes or partnership resolutions
    iii.  Documents (including checks, debit memos, cash receipts, wire transfer documents) reflecting the means by which the CD was purchased
    iv.   Retained copies of documents (including bank checks, credit memos, wire transfer documents) reflecting disbursement of the proceeds of any negotiated CD
    v.    Records reflecting interest earned, withdrawn or reinvested
    vi.   Records reflecting roll-overs
    vii.  Forms 1099, 1089 or back-up withholding documents

e.    All documents pertaining to open or closed investment or security custodian accounts, IRA, Keogh, SEP or other retirement plans in the name of, for the benefit of, or under the control of the entities, including:

    i.    Documents (including checks, debit memos, cash receipts, wire transfer documents) reflecting the means by which the securities were purchased
    ii.   Retained copies of documents (including bank checks, credit memos, wire transfer documents) reflecting disbursement of the proceeds of any negotiated securities
    iii.  Confirmation slips
    iv.   Monthly statements
    v.    Payment receipts
    vi.   Safekeeping records and logs
    vii.  Receipts for receipts or delivery of securities
    viii. Forms 1099, 1089 or back-up withholding documents

f.    Bank correspondence files

g.    All documents pertaining to all Cashiers', Manager's, or Bank Checks, Traveler's Checks, or Money Orders purchased or negotiated by or on behalf of the entities, including:

    i.    Documents (including checks, debit memos, cash

4

receipts, wire transfer documents) reflecting the means by which the checks or money orders were purchased

   ii.   Retained copies of documents (including bank checks, credit memos, wire transfer documents) reflecting disbursement of the proceeds of any negotiated checks or money orders

  iii.  Applications for purchase of checks or money orders

   iv.  Retained copies of checks or money orders

h.   All documents pertaining to wire transfers sent or received by or on behalf of the entities, including:

    i.   Retained copies of Fed Wire, Swift or other money transfer or message documents

   ii.   Documents (including checks, debit memos, cash receipts, and wire transfer documents) reflecting the source of the funds wired out

  iii.  Documents (including bank checks, credit memos, and wire transfer documents) reflecting the ultimate disposition of the funds wired in

   iv.  Notes, memoranda or other writings pertaining to the sending or receipt of wire transfers

i.   All documents pertaining to current or expired safe deposit box rentals in the name of, for the benefit of, or under the control of the entities (including keys necessary to access such safe deposit boxes).

j.   All documents pertaining to open or closed bank credit cards in the name of, for the benefit of, or under the control of the entities, including:

    i.   Applications for credit

   ii.   Corporate board authorization minutes or partnership resolutions

  iii.  Retained copies of credit reports

   iv.  Monthly statements

    v.   Financial statements

   vi.   Charge tickets

  vii.  Documents (including checks, debit memos, cash receipts, wire transfer documents) reflecting payments on the account

7.   All records of payment of dividends, loans, salary, wages, distributions, and other disbursements from a) the entities

5

to its officers, members, stockholders, and directors or relatives of any of the foregoing; and b) from any source to Lewis R. Law, Keri B. Law, or Ruth Law.

8.   Federal and state income tax returns and quarterly estimated tax returns, including Schedules K-1, and related work papers and supporting documents.

9.   All documents showing the entities' purchase, ownership, lease (as lessor or lessee), or sale of any asset, personal or real.

10.  All documents reflecting any loan or gift made by any of the entities to someone other than its officer, member, stockholder, or director and/or to employees, stockholders and/or officers of the entities.

11.  All documents reflecting any loan or gift made to any of the entities by someone other than its officer, member, stockholder, or director and/or to employees, stockholders and/or officers of the entities.

12.  All   documents   showing   calculations,   additions, reductions, and contributions to capital accounts of members, including all records used for entries for Schedule M1 and M2 on the Balance Sheets for the entities and for the Schedule K-1 of Forms 1120.

14.  All records relating to certified audits including audit reports, workpapers, letters, correspondence, and financial statements.

15.  Any and all records of assets or liabilities held by the entities for clients or members, including bank account (savings or checking) statements, advices of deposits, advices of withdrawal, purchases, deeds, closing statements for purchase or sale of real property, deeds of trust, promissory notes, other lending documents, stock certificates, margin account statements, documents of margin advances and payments, signature cards for checking, savings and brokerage accounts, applications for margin accounts and loans.

16.  All correspondence to and from the entities' clients, accountants, employees and contract labor, including e-mails.

17.  Records of any motor vehicle including motorcycles and all terrain vehicles including titles, contracts for purchase, sale

and maintenance, expenses, income, lease payments, storage and related records and correspondence.

18. Records pertaining to any aircraft and/or watercraft, including titles, contracts for purchase, sale and maintenance, expenses, income, lease payments, storage and related records and correspondence.

19. Receipts, invoices, deposit tickets, bank statements, credit card statements and receipts, cancelled checks, check registers and receipts, money orders and receipts, traveler's checks and receipts, passbook savings account books, and wire transfer documents.

20. Bank loan records, financial statements, loan payment histories, Investment records, stocks and bonds, and investment statements.

21. IRS Forms 1040, 1065, 1120S, W-2, 1099 and W-2G and supporting schedules.

22. Deeds, titles and other documents related to the ownership, control or other interest in assets.

23. Any and all contracts to which the entities or individuals are a party

24. Notebooks or other paper documents reflecting hand written or typed information reflecting monetary amounts due to employees for services performed.

The above description of items to be seized includes all of the foregoing items of evidence in whatever form and by whatever means such materials, their drafts, or their modifications may have been created or stored any handmade form (such as writing), any photocopies, any mechanical form (such as printing or typing), any electrical, electronic, or magnetic form or data (such as any information on electronic or magnetic storage device or media, such as floppy diskettes, hard disks, CD/DVD, USB drives, or any other portable computer media) and any other form (such as photograph, printer buffer, video tape or magnetic audio tape).

In addition, computer hardware, software, documentation, passwords, data security devices, and data, as further described in the affidavit incorporated by reference into this search warrant, are also to be seized.

7

State of West Virginia

County of Kanawha, to wit:

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR A SEARCH WARRANT

I, ERIC J. PHILLIPS, being first duly sworn, do hereby depose and say:

### INTRODUCTION

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search for certain things, more particularly described in the Attachment B, located within a residence found at 1302 7th Avenue, Charleston, Kanawha County, West Virginia, 25302, more particularly described in the following paragraphs and in Attachment A.

### NATURE OF INVESTIGATION

2.  The United States is investigating LEWIS R. LAW (hereinafter "LAW") and KERI B. LAW (hereinafter "KERI") for violations of 26 U.S.C. §§ 7201 (attempt to evade or defeat tax), 7202 (willful failure to pay over tax), 18 U.S.C. § 371 (conspiracy to impair and impede the lawful function of the IRS).

3.  These violations arise from LAW and KERI's formation and/ or use of various corporations, namely A E Associates, LTD., Allegheny Eastern Associates Inc., Law Land and Leasing,

1

Inc., and Wildwood Realty, Inc.; as well as bank accounts and other assets held in nominee names to evade payment of federal taxes due on quarterly payroll taxes and penalties assessed on corporations for which LAW was the responsible party and pay personal expenses from corporate assets. Review of data obtained from the IRS tax return database, commonly known as the Integrated Data Retrieval System (hereinafter referred to as IDRS) has given rise to criminal tax violations concerning A E Associates, Ltd. of which LAW is the responsible party.

## AGENT BACKGROUND

4.   I am a Special Agent of the Internal Revenue Service Criminal Investigation Division (hereinafter "IRS"), and as such, I am a federal law enforcement officer within the meaning of Rule 41 of the Federal Rules of Criminal Procedure, and I am authorized to apply for and serve search warrants and make arrests. I have been employed as an IRS Special Agent since January of 2010. Prior to my employment with IRS, I was an accountant for over seven years. My experience as an accountant included over two years as a corporate accountant and over five years working in the public accounting industry. As a corporate accountant I was responsible for maintaining and reconciling accounting ledgers and bank accounts; preparing, analyzing, organizing, and interpreting financial and accounting data; and assessing corporate processes and procedures to identify

2

weaknesses and recommend improvements. As a public accountant I prepared and reviewed complex tax returns, financial statements, audit reports, and other regulatory reports; managed various assurance and tax engagements; and researched accounting, auditing, and tax related issues. I have been a Certified Public Accountant since January 2006 and a Certified Fraud Examiner since November 2008.

5.    As an IRS Special Agent I have received approximately 25 weeks of training in the investigation of criminal violations of the Internal Revenue Code, currency transaction offenses in violation of the Bank Secrecy Act, and the laundering of monetary instruments in violation of Title 18, Sections 1956 and 1957. In addition I have attended various specialized training seminars on money laundering and related financial crimes. This training has specifically covered the means and techniques, by which individuals engaged in criminal activities; derive, launder, conceal and spend their illegal profits and their use of assets to facilitate their unlawful activity. My training has also included means and techniques used by individuals to evade reporting and paying income tax including the use of nominees and misclassification of personal expenses as business expenses.

6.    Based upon my work experience and consultation with senior special agents, I know that in the normal operation of a business, business records are created. Business records are

vital to the day-to-day operation, obtaining financing, and for the preparation of tax returns.

7.    I know that individuals involved in tax fraud activities oftentimes willfully and knowingly misclassify personal expenditures as business expenditures and fail to report these expenditures as taxable income on their personal income tax returns. I know that in order for the business owner to conceal and hide sources of taxable income, books and records are sometimes falsified. I further know that many times company shareholders, owners, and officers who have skimmed money from their companies by having the company pay personal expenses also deduct these personal expenses on the corporate tax returns. By doing this, these owners, shareholders, and officers understate the taxable income (for corporations) and ordinary income (for S corporations) and understate the taxable income the officers, shareholders, and owners report on their Forms 1040.

8.    I know that oftentimes business owners will deposit all or portions of corporate proceeds into personal bank accounts, or nominee bank accounts thereby evading the income tax that would be due on the corporate income tax returns as well as making this personal income more difficult to identify. I also know that monetary instruments, such as money orders and cashier's checks, utilized by individuals engaged in schemes to

evade taxes are oftentimes secured in safe-deposit and lock boxes.

9.    I know that individuals involved in tax fraud and other illegal activities oftentimes place income and assets in the name of accomplices, commonly known as nominees, in hopes of shifting the responsibility for the payment of tax and concealing their ownership to protect the assets from seizure. However, it is also my experience that the titles and deeds to said assets are maintained by the subject and not the nominee owner.

10.    I am experienced in analyzing business and personal financial records created and maintained by legal and illegal business entities. Such analysis determines the validity of the books and records and provides leads to unreported income and non-deductible expenditures.

11.    I am aware that business and personal financial records are required to be maintained for tax preparation and audit purposes. Based on my experience and training, I know that these records are commonly stored for lengthy periods of time at residences, at business offices, in vehicles and other storage facilities.

12.    These business and personal financial records are typically stored on computers and electronic storage devices and in file cabinets, desk and cabinet drawers, safes and safe-

deposit boxes, lock boxes, wallets, purses and handbags, garbage bags, cardboard boxes, and other storage containers large enough for paper record retention.

13.  I know from experience that in order to accurately reconstruct the personal and business financial histories of taxpayers and their various businesses, all forms of business and personal records reflective of financial transactions are required. I am aware that individuals involved in conspiracies to defraud the IRS conduct financial transactions jointly, and at times, individually, with the same goals and objectives, i.e., tax evasion. I am also aware that individuals engaged in conspiracies to defraud the IRS and to commit other crimes often communicate with one another as well as with unwitting accomplices. I know these communications can occur in many forms including person to person, telephonic and electronic such as email. These communications typically involve details pertaining to the scheme, directions to subordinates as to how to carry out certain elements of the scheme and correspondence to and from unwitting third parties such as financial institutions and accountants.

14.  I know that individuals involved in criminal endeavors conduct financial transactions in a manner to avoid law enforcement detection. Based upon my training, I know that persons involved in tax crimes exchange currency for various

types of monetary instruments including postal money orders and bank cashiers' checks and, thereby, attempt to disguise and conceal their true business and personal affairs.

15.   In the course of this investigation I have reviewed Internal Revenue Service Records; records from numerous federal, state and local governmental agencies, reviewed financial records obtained by grand jury subpoena; reviewed public records; and reviewed witness statements obtained by the Revenue Officer during her collection efforts. The following information is based upon those sources. Because this affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of a search warrant, it does not include all of the facts that have been learned during the course of this investigation.

**<u>BACKGROUND OF SUBJECTS OF INVESTIGATION</u>**

16.   The following information was obtained from analysis of records from the West Virginia Secretary of State's Office (hereinafter referred to as WVSOS), West Virginia Department of Motor Vehicles (hereinafter referred to as WV DMV), Kanawha County Clerk's Office, United Bank, N.A., BB&T, N.A., Wesbanco, and JPMorgan Chase Bank, N.A.:

　　a.   LAW, born on May 26, 1936, has been in the professional engineering and surveying industry since at least 1982. Law was one of two of the original directors of

A E Associates, LTD. As the sole officer and stockholder of Mine Management, Inc. (hereinafter referred to as MMI), Law and MMI were both convicted for violating the Clean Water Act on September 25, 1992. MMI and LAW were fined $80,000 each and LAW was sentenced to serve two (2) years in prison plus one year supervised release. LAW served his sentence at the Federal Correctional Institution in Ashland, Kentucky. LAW was released from the Federal Correctional Institution in Ashland, Kentucky on September 2, 1994.

b.   KERI is LAW's 26 year old daughter. As recently as 2009, KERI attended Mountaineer Beauty College.

c.   On February 17, 1978, LAW incorporated Law Land and Leasing, Inc., listing himself as the sole director and shareholder of the corporation. Currently, KERI is the only director and officer listed with the WVSOS for Law Land and Leasing, Inc. KERI holds the positions of president, secretary, treasurer, and vice-president. 1302 7th Avenue, Charleston, Kanawha County, West Virginia is listed as both the notice of process address and the principal office address for Law Land and Leasing, Inc.

d.   On August 10, 1982, Joseph Speed Jones (hereinafter "Jones") incorporated A E Associates, LTD. Jones and LAW were originally the only directors on record with the WVSOS. Currently, LAW is the president and only

8

officer of A E Associates, Ltd. The notice of process address and the principal office address for A E Associates, LTD. are both listed with the WVSOS as 323 Call Road, Suite 112 in Charleston, Kanawha County, West Virginia.

    e.   On April 15, 1987, Ruth Law (hereinafter "R. Law"), LAW's deceased mother, and William Law (hereinafter "W. Law"), LAW's brother, incorporated Wildwood Realty, Inc. Originally R. Law, W. Law, and Charles E. Hurt were listed as the only directors of Wildwood Realty, Inc. As of the Annual Report filed with the WVSOS on June 2, 2008, R. Law was the President and Secretary; and LAW was the Vice-President and Treasurer of Wildwood Realty, Inc. As of the Annual Report filed with the WVSOS and dated July 8, 2009, KERI is currently listed as the sole officer of Wildwood Realty, Inc. and 1302 7th Avenue, Charleston, West Virginia is listed as both the notice of process address and the principal office address for Wildwood Realty, Inc.

    f.   On June 5, 2009, KERI incorporated Allegheny Eastern Associates, Inc. with LAW as the registered agent for service of process, with an address of PO Box 6456 in Charleston, Kanawha County, West Virginia. LAW's name was originally typed into the "name of person who is signing articles of incorporation" on the Articles of

Incorporation, but was crossed out and replaced by KERI's name hand-written on the form. The principal office address for Allegheny Eastern Associates, Inc. is 1302 7th Avenue, Charleston, Kanawha County, West Virginia. On the Certificate of Reinstatement filed with the WVSOS on February 23, 2011, KERI was listed as President and sole officer for Allegheny Eastern Associates, Inc.

    g.    The 2000 Dodge Dakota with West Virginia Motor Vehicle Registration number OUL-325 has A E Associates, LTD in red lettering on both doors. The 2000 Dodge Dakota was observed at LAW's residence in St. Albans, WV on March 31, 2011 at approximately 9:05 AM and again at approximately 5:30 PM. On April 4, 2011, at approximately 8:45 AM, LAW was observed walking out of the office of A E Associates, Ltd. and getting into the 2000 Dodge Dakota. LAW drove the 2000 Dodge Dakota South on Interstate 77 (I-77S) to the Capitol Street exit in Charleston, WV. On June 29, 2011, the 2000 Dodge Dakota was observed in the A E Associates, Ltd. parking lot at approximately 9:15 AM; at approximately 4:24 PM LAW was observed leaving the A E Associates, Ltd. office building and getting into the 2000 Dodge Dakota. At approximately 6:20 PM, also on June 29, 2011, Law was observed in the 2000 Dodge Dakota turning onto B Street and driving towards his residence.

h.   On September 15, 2011, at approximately 5:15 PM, KERI was observed exiting the Hair We Are Salon & Spa, at 1117 Fledderjohn Road, Charleston, Kanawha County, West Virginia, and getting into a white Saturn Aura with West Virginia license plate number 8MT-564. At approximately 6:30 PM KERI was observed turning into the driveway of 1302 7th Avenue, Charleston, Kanawha County, West Virginia. KERI was seen exiting the white Saturn and walking towards the back of the residence at 1302 7th Avenue. KERI was then seen coming out of the front door of 1302 7th Avenue and reaching into the mailbox to the side of the front door and returning inside the residence. KERI then walked from the backside of 1302 7th Avenue and returned to the White Saturn.

i.   On September 21, 2011, at approximately 5:25 PM, KERI was observed leaving the Hair We Are Salon & Spa, and getting into the front, driver-side of the white Saturn Aura with West Virginia license plate number 8MT-564. KERI drove the Saturn to 1302 7th Avenue and parked in the driveway on Beatrice Street. KERI walked from the back of the residence and returned to the front driver-side of the white Saturn. After backing the white Saturn out of the driveway, KERI drove to the JP Morgan Chase bank drive-thru on the corner of Virginia and Summer Streets, Charleston,

Kanawha County, West Virginia. After performing a
transaction through the drive-thru, KERI drove the white
Saturn to west on Interstate 64 (I-64) to the Teays Vellay
exit (exit 39). At the intersection of the I-64 off ramp
and West Virginia Route 34 (WV 34), KERI turned left onto
WV 34and stayed on WV 34 until she turned right onto
Weatheridge Drive, Hurricane, Putnam County, West Virginia.

    j.  On September 26, 2011, at approximately 5:10 AM
special agents retrieved the following items from the
refuse bin that was labeled as belonging to and located in
the parking lot of 108 Weatheridge Drive, Hurricane, Putnam
County, West Virginia:

    1. Statement from Charleston Sanitary Board; account
ending #***-****-01-1; service address 1302 7th
Avenue; Owner Ruth Law; Billing date August 5,
2011; Billing Period June 21, 2011 – July 20,
2011; Total Amount Due $125.27;

    2. Statement from West Virginia American Water;
account #**-*****81-9; service address 1302 7th
Avenue; Addressee Keri Law, 1302 7th Avenue,
Charleston, WV 25302-1232; Total Amount Due Upon
Receipt $49.63;

    3. Statement from Fayette Awning & Glass, Inc.,
Oakhill, WV 25901; customer ID Law, Keri;

Addressee Keri Law, 1302 7th Avenue, Charleston, WV 25302-1232; Total Amount Due $215.64 on September 10, 2011;

4. Credit Card exclusive offer and application from Chase Bank; with a respond by date of September 26, 2011; addressed to Wildwood Realty, 1302 7th Avenue, Charleston, WV 25302-1232;

5. Credit Card exclusive offer and application from Chase Bank; with a respond by date of October 17, 2011; addressed to Keri B. Law, 1302 7th Avenue, Charleston, WV 25302-1232;

6. Statement from First Premiere Bank; for the period July 14, 2011 – August 12, 2011; account #**** **** **** 6165; Addressee Keri B Law, 1302 7th Avenue, Charleston, WV 25302-1232; Balance Due $202.49; Minimum Amount Due $30.00; Due Date September 9, 2011

## Background of Trust Fund Recovery Penalty Assessment

17.   Based upon my review of records of the IRS, WVSOS, and
Kanawha County Clerk's Office; review of financial records
obtained by grand jury subpoenas; interviews of an IRS Revenue
Officer; analysis of records maintained by the Revenue Officer;
and through my observations, I have learned the following:

a. During 2006, A E Associates, Ltd. failed to make all
Federal Tax Deposits (FTDs) or file the related Forms
941, for the periods ending September 30, 2006 and
December 31, 2006.

b. On October 24, 2006, the IRS Revenue Officer (RO)
received an alert regarding missed FTDs by A E
Associates, Ltd. The FTDs were related to employment
taxes not paid over to the IRS.

c. On February 20, 2007 the IRS received Form 941 along
with a check in the amount of $41,458.68, leaving an
outstanding balance of $3,649 for the period ending
September 30, 2006. The IRS also received Form 941 for
the period ending December 31, 2006. However, payment
was not received by the IRS; leaving a balance due to
the IRS of $88,784.35 for the period ending December
31, 2006.

d. During the first quarter of 2007, A E Associates, Ltd.
failed to make any FTDs or file the related Form 941,

for the period ending March 31, 2007. As of June 8, 2007, A E Associates, Ltd. owed FTDs totaling: $87,937 for the period ending March 31, 2007; $109,991 for the period ending December 31, 2006; and $3,649 for the period ending September 30, 2006.

e. On June 27, 2007, the RO assigned to the A E Associates, Ltd. account advised LAW that a Trust Fund investigation would be conducted and a Trust Fund Recovery Penalty[1] (TFRP) would be assessed to all individuals responsible for the unpaid trust fund taxes. LAW inquired with the RO about the TFRP and the RO explained why officers, owners, CFOs, managers, etc. could be held personally responsible for unpaid employment taxes. The RO also advised LAW that he (LAW) would have the right to appeal the assessment of the TFRP. LAW understood the assessment process of the TFRP and did not ask any questions regarding the conversation with the RO.

f. On June 25, 2007, the IRS successfully executed a federal tax lien against A E Associates, Ltd., for a

---

[1] Trust Fund Assessments, also known as the Trust Fund Recovery Penalty, are penalties assessed for the nonpayment of payroll taxes.  The Trust Fund Assessments are assessed against an individual who is deemed as the "responsible person" by the IRS.

total of $201,577 for the periods ending September 30, 2006; December 31, 2006; and March 30, 2007.

g. On July 31, 2007, the IRS received Form 941 from A E Associates, Ltd. indicating total tax of $93,288.75 for the period ending June 30, 2007. FTDs made during the period were zero leaving a balance due to the IRS for the period ending June 30, 2007, of $93,288.75.

h. On September 12, 2007, the RO assigned to the A E Associates, Ltd. account met with LAW. At the meeting, the RO provided Publication 1, Taxpayer Rights, to LAW; provided an explanation of its contents; and answered LAW's questions regarding the trust fund investigation and his rights according to Publication 1, Taxpayers Rights. During the meeting LAW advised the RO that:

i. LAW is the President and part-owner of A E Associates, Ltd.;

ii. LAW is the only person on the bank signature card for both corporate bank accounts and signs all checks;

iii. LAW determines company policy and makes both day-to-day and long-term decisions to keep the company operating;

      **iv.** LAW has co-signed and signed for loans in the company's name

18. Based on the information provided by LAW, the RO identified LAW as responsible and willful for the unpaid trust fund taxes of A E Associates, Ltd. The RO explained to LAW that he is responsible for the unpaid trust fund taxes. The RO addressed LAW's ability to pay the TFRP in-full once it had been assessed.

   a. On November 28, 2007, the IRS assessed the TFRP to LAW for the following periods: ending December 31, 2006; ending March 30, 2007; and ending June 30, 2007. The TFRP was assessed to LAW because he was deemed, by the IRS, to be personally responsible for A E Associates, LTD.'s failure to pay all required FTD.

   b. On January 25, 2008, the IRS received, via fax, an appeal of the personal assessment of the TFRP from LAW and treasurer of A E Associates, Ltd, Daniel T. Whitlock (Whitlock). Subsequently, the IRS Appeals Division has upheld the assessment of the TFRP to LAW.

   c. On May 27, 2008, the IRS successfully recorded another federal tax lien against A E Associates, Ltd., for a total of $109,514 for the period ending June 30, 2007.

   d. On May 21, 2008, the IRS agreed to an installment agreement with A E Associates, Ltd. of $3,000.00 per

month for twelve (12) months and then $5,000.00 per month until the balance owed was fully satisfied. The IRS received eleven (11) payments of $3,000.000 for a total of $33,000.00 from July 15, 2008 through April 13, 2009. After the payment received on April 13, 2009, the IRS did not receive the additional payments required by the installment agreement.

e. On July 20, 2009, the IRS successfully recorded another federal tax lien against A E Associates, Ltd., for a total of $130,655 for the following periods: ending June 30, 2008; ending September 30, 2008; ending December 31, 2008; and ending March 31, 2009.

f. On August 31, 2009, the IRS received a fax from LAW stating that the accounts receivable balance as of July 17, 2009, for A E Associates, Ltd. was $458,017.54.

g. On October 19, 2009, the IRS successfully recorded another federal tax lien against A E Associates, Ltd., in the amount of $4,578 for the period ending June 30, 2009.

h. On October 20, 2009, the IRS sent notices of levy to all identified income sources, including: United Bank, N.A.; United National Bank; Carpenter Reclamation, Inc.; and the West Virginia Division of Highways. In

response to the levy notices, the IRS received:
$1,839.00 (United Bank, N.A.); $5,177.50 (Carpenter
Reclamation, Inc.); and $16,726.53 (West Virginia
Division of Highways).

i. On October 28, 2009, LAW's individual account was
assigned to the RO for collection.

j. On November 13, 2009, the IRS assessed the TFRP to LAW
for the following periods: ending December 31, 2008
and ending March 31, 2009. The TFRP was assessed
because LAW was deemed to be responsible for A E
Associates, LTD.'s failure to pay all required FTD
during the specified periods.

k. On December 3, 2009, the IRS RO assigned to LAW's
account met with LAW to collect personal financial
information in order to determine the collectability
of the TFRP personally assessed to LAW. LAW advised
the RO that he had a checking account at BB&T Bank.
Subsequent to sending a notice of levy to BB&T Bank,
the IRS received a response from BB&T indicating LAW
did not have any open accounts as of January 8, 2010.
The RO was informed that LAW had been receiving his
monthly Social Security deposit into the bank account
of LAW's deceased mother, R. Law.

1. On January 28, 2010, the IRS successfully recorded another federal tax lien against A E Associates, Ltd., in the amount of $4,861 for the period ending September 30, 2009.

## Overt and Affirmative Acts

19.    Based upon my review of records of the IRS, WVSOS, and Kanawha County Clerk's Office; review of financial records obtained by grand jury subpoenas; interviews of an IRS Revenue Officer and local law enforcement officers; analysis of records maintained by the Revenue Officer; and through my observations, I have learned the following:

a. In August of 2008, LAW sold a 1957 Ford Thunderbird convertible, with Vehicle Identification Number (VIN) D7FH342014, to Law Land and Leasing, Inc for $500.00. Law owned the Ford convertible from May 26, 2000 until the date of transfer in August 2008. As president of Law Land and Leasing, Inc., KERI signed the Assignment of Certificate of Title as the buyer. According to the National Automobile Dealers Association, the estimated value of the 1957 Ford Thunderbird, depending on the automobile's condition, is $19,975 - $129,250.

b. Also, in August of 2008, LAW sold a 1959 two-door Jaguar, with VIN S835838DN, to Law Land and Leasing, Inc. for $500.00. Law owned the Jaguar from June 21,

20

2000 until the date of transfer in August 2008. As president of Law Land and Leasing, Inc., KERI signed the Assignment of Certificate of Title as the buyer. According to the National Automobile Dealers Association, the estimated value of the 1959 Jaguar, depending on the automobile's condition, is $40,480 - $124,350.

c. In August of 2008, LAW sold a 1969 Harley Davidson motorcycle, with VIN 69FLH15136, to Law Land and Leasing, Inc. for $500.00. LAW owned the Harley Davidson from June 21, 2000 until the date of transfer in August 2008. As president of Law Land and Leasing, Inc., KERI signed the Assignment of Certificate of Title as the buyer. According to the National Automobile Dealers Association, the estimated value of the 1969 Harley Davidson, depending on the motorcycle's condition, is $6,000 - $21,775.

d. On September 30, 2009, LAW signed an Assignment of Certificate of Title for a 1986 Chevrolet Corvette, with VIN 1G1YY0788G5107309. The purchaser as named in the Assignment of Certificate of Title was Beckley Preowned Cars, Inc. Law owned the Corvette from July 29, 1988 until the date of sale in November 2009. The sale price according to the Assignment of Certificate

of Title was $500.00. According to the National Automobile Dealers Association, the estimated value of the 1986 Chevrolet Corvette, depending on the automobile's condition, is $4,845 - $15,970.

e. On December 3, 2008, LAW transferred his residence at 16 B Street, St. Albans, Kanawha County, West Virginia, as well as the two parcels of property on which the residence is located, from himself to Law Land and Leasing, Inc., in exchange for consideration in the amount of $25,000.00. LAW had originally purchased the property on August 12, 1982, for $135,000.00; and the gross assessed value for the 2010 tax year was $117,420.00. LAW continues to control the property and reside at 16 B Street, St. Albans, Kanawha County, West Virginia, despite having transferred the title to Law Land and Leasing, Inc.

f. On October 8, 2009, LAW incorporated Law Land & Leasing, Inc.; listing KERI as the president. On November 16, 2009, KERI filed articles of dissolution for Law Land & Leasing, Inc.

g. On January 22, 2010, LAW opened a business checking account at the WesBanco branch in Sissonville, West Virginia in the name of Allegheny Eastern Associates, Inc. LAW was listed as the sole signer for the

account. Between January 25, 2010 and March 3, 2010, LAW deposited five (5) checks, totaling $105,674.36, from the State of West Virginia made payable to A E Associates, Ltd., into the Allegheny Eastern Associates, Inc. account.

h. On January 25, 2010, KERI signed and filed an Annual Report with the WVSOS for Law Land and Leasing. Per the Annual Report, KERI replaced LAW as the president, vice-president, secretary, treasurer, and sole director. The Annual Report was also used to change the mailing address of Law Land and Leasing from PO Box 6456, Charleston, WV to 1302 7th Avenue, Charleston, WV 25302.

i. Based on the existence of The Keri B Law Trust DTD 21Jun90 F/B/O Keri B Law (hereinafter "the Trust") and LAW's use of the Trust in the past; the transfers indicated in paragraphs 38 – 42 and the placement of KERI as the sole officer and director of Law Land and Leasing, Inc., as discussed in paragraphs 42 and 43 above, do not appear to be the result of succession planning.

j. According to the Transfer of Interest obtained from the U.S. Coast Guard, on December 16, 1991, LAW granted title of the Marcus Berman III, a 50' 1972

Whitcraft boat, to the Trust. On January 4, 2010, the Trust granted title of the Marcus Berman III to KERI.

k. On May 16, 2011, KERI opened a business checking account in the name of Law Land and Leasing, Inc. at the JPMorgan Chase Bank, N.A. Charleston Main branch in Charleston, West Virginia. KERI is listed as the sole signer on the account and listed the business address as 1302 7th Avenue, Charleston, Kanawha County, West Virginia, 25302.

l. On September 3, 2011, officers of the Saint Albans Police Department, Saint Albans, Kanawha County, West Virginia responded initially to a domestic dispute with shots fired. After clearing the initial call to 16 B Street, Saint Albans, West Virginia officers of the Saint Albans Police Department were called back to LAW's residence to perform a welfare check of Darlene White-Law, LAW's spouse. While responding to the call at LAW's residence, officers observed a classic Ford Thunderbird and older Harley Davidson motorcycle in LAW's garage.

m. On October 12, 2011, IRS agents interviewed Darlene White-Law (WHITE-LAW) at 16 B Street, St. Albans, West Virginia, during the execution of a search warrant on the premises.  WHITE-LAW said that after the IRS began

24

investigating LAW, he transferred his assets to his daughter, KERI, and that the records of those transactions would be located at KERI's former residence in Charleston.   WHITE-LAW then provided agents with the address of that residence, which is 1302 7th Avenue, Charleston, West Virginia.   WHITE-LAW also said that LAW stores firearms belonging to him at the 1302 7th Avenue residence.

### Analysis of Tax Returns and Bank Records

20. Analysis of IDRS data pertaining to LAW's Forms 1040 reveals the following:

a. for the year ended December 31, 2005, LAW received wages in the amount of $94,630 from A E Associates, LTD; LAW's taxable interest income was $7,291; LAW had net capital gain income of $20,100; LAW's taxable income from pensions and annuities was $3,528; LAW had a net Schedule E business losses of $17,075; LAW's taxable social security benefits were $21,394; and LAW's total income was $126,659;

b. for the year ended December 31, 2006, LAW received wages in the amount of $82,956 from A E Associates, LTD; LAW's taxable interest income was $6,197; LAW had net capital gain income of $39,576; LAW's taxable income from pensions and annuities was $3,672; LAW had

a net Schedule E business loss of $9,399; LAW's taxable social security benefits were $18,350; and LAW's total income was $141,352;

c. for the year ended December 31, 2007, LAW received wages in the amount of $72,728 from A E Associates, LTD; LAW's taxable interest income was $3,618; LAW had net capital gain income of $85,476; LAW's taxable income from pensions and annuities was $3,792; LAW had a net Schedule E business loss of $13,577; LAW's taxable social security benefits were $18,952; LAW's total income was $170,989; and LAW's taxable income was $152,167;

d. for the year ended December 31, 2008, LAW received wages in the amount of $44,694 from A E Associates, LTD; LAW's taxable interest income was $104; LAW's taxable income from pensions and annuities was $3,876; LAW's taxable social security benefits were $19,389; LAW's total income was $68,063; and LAW's taxable income was $52,944;

e. for the year ended December 31, 2009, LAW did not report any wages from A E Associates, LTD or any other source; LAW's taxable interest income was $242; LAW's taxable income from pensions and annuities was $6,608; LAW had net Schedule E business income of $1,200;

26

LAW's total income was $8,050; and LAW had no taxable income;

21. Analysis of IDRS data pertaining to A E Associates, LTD's Forms 1120 reveals the following:

    i. for the year ended December 31, 2007, A E Associates, LTD reported total income of $1,468,131; compensation of officers of $104,108; salaries and wages of $1,166,189; total expenses of $1,515,546; and a net operating loss of $47,415;

    ii. for the year ended December 31, 2008, A E Associates, LTD reported total income of $1,155,491; compensation of officers of $75,624; salaries and wages of $778,885; total expenses of $1,159,576; and a net operating loss of $4,085;

    iii. for the year ended December 31, 2009, A E Associates, LTD reported total income of $764,343; compensation of officers of $14,000; salaries and wages of $637,728; total expenses of $999,106; and a net operating loss of $234,763;

22. Analysis of IDRS data pertaining to Allegheny Eastern Associates, Inc. reveals that corporate income tax returns have never been filed for the corporation.

23. Analysis of IDRS data pertaining to KERI's Forms 1040 reveals the following:

    i. for the year ended December 31, 2007, KERI's taxable interest income was $8,111; and KERI's taxable income was $1,311;

    ii.  for the year ended December 31, 2008, KERI's taxable interest income was $14,684; and KERI's taxable income was $2,989;

    iii. for the year ended December 31, 2009, KERI's taxable interest income was $6,012; KERI had net capital gain income of $26,161; KERI's taxable income from pensions and annuities was $750; KERI had net Schedule E business losses of $2,158; and KERI's taxable income was $18,570;

24. Analysis of bank records reveals the following:

a. On December 11, 1992 LAW opened two bank accounts at United National Bank in the name of A E Associates, LTD. Account number 00139475 was designated as the general account and account number 00139483 was designated as the payroll account;

    i. Between July 20, 2009 and December 29, 2009, eighteen (18) checks from the two A E Associates accounts held at United National Bank, were made payable to cash and endorsed by LAW, for a total of $11,809.60. All but one (1) of the checks made payable to cash during this period referenced

office, supplies, equipment, or other business
expenses;

ii.   Between January 4, 2010 and December 8, 2010,
thirty-one (31) checks from the two A E Associates
accounts held at United National Bank, were made
payable to cash and endorsed by LAW, for a total of
$23,952. All but three (3) of the checks made
payable to cash during this period referenced
office, supplies, equipment, or other business
expenses;

iii. Analysis of the A E Associates bank accounts held
at United National Bank revealed that from January
1, 2005 - July 19, 2009, no checks were made payable
to cash.

b. On January 22, 2010, LAW opened an account at
Sissonville, West Virginia, branch of Wesbanco, with
the account number 472003225, in the name of Allegheny
Eastern Associates, Inc.

i. From January 25, 2010 - March 3, 2010, five (5)
items from the West Virginia Division of Highways,
made payable to A E Associates, LTD., for a total of
$105,674.36, were deposited into the Allegheny
Eastern Associates, Inc. account at Wesbanco.

ii.  From January 25, 2010 - April 22, 2010, eleven (11) checks were written from the Allegheny Eastern Associates, Inc. bank account at Wesbanco, and made payable to A E Associates, LTD., for a total of $100,431.41.

iii. From January 5, 2010 - May 6, 2010, nineteen (19) checks were written from the Allegheny Eastern Associates, Inc. bank account at Wesbanco, and made payable to cash, for a total of $10,883. All items made payable to cash during this period were endorsed by LAW. Nine (9) of the checks made payable to cash during this period referenced office, supplies, equipment, or other business expenses.

### COMPUTERS AND ELECTRONIC STORAGE

25.  As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the premises described in Attachment A, in paper, computerized electronic data, or whatever form they are found. I submit that if a computer or electronic medium is found on the premises, there is probable cause to believe those records will be stored in that computer or electronic medium. This is true because:

   a. Based on my knowledge, training, and experience; I know that today most businesses store their records on

30

computers and electronic storage media; and that businesses often communicate through email.

b. On June 28, 2007, Whitlock provided the following computer generated financial documents for A E Associates, Ltd.: Balance Sheet dated June 30, 2007; an Income Statement for the twelve months ending June 30, 2007; a General Ledger Trial Balance as of June 30, 2007; A listing of Aged Receivables as of June 30, 2007; and an Aged Payables report as of June 30, 2007.

c. On November 2, 2009, the RO received a nine-page facsimile from LAW that included what appeared to be a computer generated document that described estimated income and expenses for A E Associates, Ltd.

d. Between January 31, 2005 and October 22, 2008, thirty (30) payments for a total of $34,687.77 from the A E Associates, Ltd. general account, were made payable to Dell Financial Services, with most payments referring to computers or computer leases in the memo section.

26. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when files have been deleted,

they can be recovered months or years later using readily available forensics tools. This is so because when a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.

27.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the hard drive that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

28.   Similarly, files that have been viewed via the Internet are typically automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

29.   Based upon my knowledge, training and experience, I know that searching for information stored in computers in this case will sometimes require agents to seize most or all electronic storage devices to be searched later by qualified computer experts in a laboratory or other controlled environment. This is necessary to ensure the accuracy and

completeness of such data and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine those storage devices in a laboratory setting, it is usually necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the laboratory setting. This is true because of the following:

a.   The volume of evidence. Computer storage devices (like hard disks or CD-ROMs) can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

b.   Technical requirements. Searching computer systems for criminal evidence sometimes requires highly technical processes requiring expert skill and properly controlled environment. The vast array of computer hardware and software available requires even

33

computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search processes are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis.

30.  In light of these concerns, I ask the Court to authorize the agents to proceed as follows:

a.   The agents will attempt to create an electronic "image" of those parts of the computer that are likely to store the things described in the warrant. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. Based upon my

experience and training, I know that it is often possible to image computers and storage media on site. If the agents successfully image the computers on the premises, the agents will not remove any of the computers from the premises.

     i.    The agents or qualified computer experts will then conduct an offsite search for the things described in the warrant from the "mirror image" copy at a later date.

     ii.    If imaging proves impractical, or even impossible for technical reasons, then the agents will seize those components of the computer system that the agents believe must be seized to permit the agents to locate the things described in the warrant at an off-site location. The seized components will be removed from the premises. If employees of the companies so request, the agents will, to the extent they deem practicable and forensically safe, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the legitimate business. If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer

35

necessary to retrieve and preserve the evidence,
the government will return it within a reasonable
time.

31.  I recognize that A E Associates, Ltd., Law Land and
Leasing, Inc., Allegheny Eastern Associates, Inc., and Wildwood
Properties, Inc. may be functioning companies with employees and
that a seizure of the companies' computers may have the
unintended effect of limiting the companies' ability to provide
service to its legitimate customers. In response to these
concerns, the agents who execute the search anticipate taking an
incremental approach to minimize the inconvenience to the
companies' legitimate customers and to minimize the need to
seize equipment and data.

32.  I have no reason to believe that the search is likely
to result in the seizure of any drafts of publications (such as
books, newsletters, Web site postings, etc.) that are unrelated
to the search and stored on the target computers. Thus, the
search will not implicate the Privacy Protection Act, 42 U.S.C.
§ 2000aa. I have no reason to believe that the search is likely
to result in the seizure of a mail server. Thus, the search will
not implicate the Electronic Communications Privacy Act, 18
U.S.C. §§ 2701.

## SUMMARY OF PROBABLE CAUSE

33.  Based upon my review and analysis of the personal and

business financial transactions conducted by LAW and KERI; as well as my review and analysis of their federal income tax returns and return information and that of A E Associates, Ltd., Law Land and Leasing, Inc., Allegheny Eastern Associates, Inc., and Wildwood Properties, Inc.; as well as my review of records obtained from other government agencies; and statements of witnesses and other law enforcement officers participating in this investigation, I have probable cause to believe that LAW and KERI have, since at least 2008, engaged in a conspiracy to defraud the Internal Revenue Service in violation of 18 U.S.C. § 371, attempted to evade assessment and payment of individual and corporate income taxes in violation of 26 U.S.C. § 7201, and have failed to pay employment taxes in violation of 26 U.S.C. § 7202.  Moreover, I have probable cause to believe that LAW, having been convicted of a felony, is in the possession of firearms, in violation of 18 U.S.C. § 922(g)(1), which I have probable cause to believe are stored at 1302 7th Avenue, Charleston, West Virginia.

34.  Further, based upon my experience, training and knowledge set forth above, and based upon the facts set forth above, the type of records sought are typically retained by individuals in their residences and places of businesses, and probable cause exists to believe that the broad range of financial records, including computerized records, listed in

37

Attachment B are located on the premises to be searched and that these items will constitute evidence of the above stated offenses.  I also have probable cause to believe that firearms, unlawfully possessed by LAW, will be found on the premises and that such firearms will constitute both evidence of an offense and contraband, fruits of crime, or other items illegally possessed.

Further the affiant saith naught.

_____

ERIC J. PHILLIPS
SPECIAL AGENT, INTERNAL REVENUE SERVICE

Taken, subscribed, and sworn to before me this _12th_ day of _Oct_, 2011.

_____

MARY E. STANLEY
United States Magistrate Judge

38